906 F.2d 1192
 134 L.R.R.M. (BNA) 2844, 116 Lab.Cas. P 10,203,
17 Fed.R.Serv.3d 216
 Frederick DAHNKE, Plaintiff,
and
Kelly & Haus, Counsel for Frederick Dahnke, Appellants,
Cross-Appellees,
v.
TEAMSTERS LOCAL 695, a/w International Brotherhood of
Teamsters, Chauffeurs, Warehousemen & Helpers of
America; Stokely USA, Inc.,
Defendants-Appellees, Cross-Appellants.
 Nos. 88-3156, 88-3217 and 88-3238.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 23, 1989.
Decided July 18, 1990.
 
 Carol Rubin, William Haus, Kelly & Haus, Madison, Wis., for plaintiff-appellant.
 Frederick Perillo, Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, Donald J. Driscoll, Marshall Berkoff, Michael, Best & Friedrich, Milwaukee, Wis., for defendants-appellees.
 Carol Rubin, Kelly & Haus, Madison, Wis., for appellant.
 Before CUDAHY, POSNER and KANNE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Frederick Dahnke, an employee at Stokely USA's Poynette, Wisconsin facility, was fired after he accrued twelve points under the company's No Fault Absentee Program. He challenged his termination, arguing that Stokely discharged him without just cause and that Teamsters Local 695 breached its statutory duty to represent him fairly. The district court awarded summary judgment to the defendants and imposed Rule 11 sanctions on the plaintiff and his lawyer. We affirm in part, vacate in part and remand.I.
 
 
 2
 In May 1980, Stokely hired Frederick Dahnke as a fork-lift operator. As a result, Dahnke became a member of the bargaining unit represented by Teamsters Local 695 and was therefore entitled to the benefits included in the collective bargaining agreement negotiated by the Union and the Company.
 
 
 3
 Approximately six years later, Stokely instituted a "No Fault Absentee Program"; under the Program, Stokely assessed each employee a prescribed number of points each time he arrived late for work. Stokely assessed one-third of a point for "tardiness" (one to seven minutes late), two-thirds of a point for "lateness" (eight or more minutes late), one point for absence and three points for unexcused absence.[1] At the same time, Stokely issued written warnings to employees when they accumulated certain point levels; once an employee accrued twelve points, however, he was discharged from his job.
 
 
 4
 The No Fault Absentee Program engendered substantial employee criticism; indeed, after its implementation, Local 695 filed a grievance claiming that Stokely had breached the collective bargaining agreement by unilaterally adopting the Program. Stokely and Local 695 settled the dispute before the arbitration hearing was to take place; the parties agreed that the Program would become effective with the 1987-1988 collective bargaining agreement, but that all employees would start with a clean slate. Stokely employees ratified the Program in January 1987.
 
 
 5
 As a Stokely employee, Fred Dahnke was subject to the No Fault Absentee Program. In February 1987, Stokely sent Dahnke a warning notice that he had accrued three points under the Program. One month later, Stokely warned Dahnke that he had accrued five points; two months after that, when Dahnke had accumulated eight points, Stokely sent him this message: "Final Warning: Suspended suspension [sic]. Accumulation of twelve occurrences will result in discharge." Seemingly undeterred (he did not protest any of the points assessed against him), Dahnke accrued five more points by August 24, 1987, and, when he did not report to work the next day, he was discharged for having accrued more than twelve points under the Program.
 
 
 6
 With the assistance of employee-steward Dave Ebert, Dahnke filed a grievance contesting his discharge, alleging that the No Fault Program had been applied arbitrarily. Pursuant to the grievance process, Union Business Agent Sam Anderson called a meeting to discuss Dahnke's complaint: Anderson met with Union stewards Ebert and Jim Crawford, Company Personnel Manager Lyle Mathwich and Distribution Center Manager Darrell Vogt. At the meeting, Mathwich assured Anderson that he was unaware of exceptions to the No Fault Program, but he added that he would investigate the allegation. Anderson also asked Mathwich about Union steward Ebert's contention that the punch clock was defective. Mathwich explained that while the face of the clock occasionally strayed by one or two minutes, the punched time was always accurate. Nonetheless, Mathwich promised to investigate this allegation as well.
 
 
 7
 After ensuring that Dahnke's points had been assessed and totaled properly, Anderson concluded that the grievance lacked merit and declined Dahnke's request to pursue the matter further. Anderson based his decision on Dahnke's failure to protest any of the points he accrued before the discharge, as well as Dahnke's inability to demonstrate that the time clock contributed to his continued tardiness. Further, Anderson learned of only a few instances where the No Fault Program had not been applied uniformly; he surmised that these would be insufficient to persuade Stokely (or, ultimately, an arbitrator) that Dahnke was somehow prejudiced by a few incorrect applications of the Program. On October 9, 1987, Anderson wrote to Dahnke and told him:
 
 
 8
 I do not believe the arbitration procedure would result in your reinstatement, as I have tested like attendance policies in the past and have lost. Therefore, I am not taking any further steps on your grievance....
 
 
 9
 Letter from Sam Anderson to Fred Dahnke (Oct. 9, 1987).
 
 
 10
 On February 25, 1988, Dahnke filed a complaint with the Wisconsin Employment Relations Commission alleging that Stokely had discharged him without just cause (in violation of the collective bargaining agreement) and that Teamsters Local 695 had breached its duty of fair representation to him. Pursuant to section 301(a) of the Labor-Management Relations Act of 1947 (29 U.S.C. Sec. 185), the defendants requested that the case be removed to federal district court. On August 30, 1988, the district court granted the defendants' motions for summary judgment and imposed Rule 11 sanctions, in the amount of the defendants' attorney's fees, on Dahnke and his attorney for bringing a "frivolous" action. Dahnke and counsel appeal from the district court's decision; Local 695 and Stokely cross-appeal.
 
 II.
 
 11
 Dahnke argues that we must reverse the district court's decision because Judge Shabaz misstated the proper standard for summary judgment. Judge Shabaz wrote:
 
 
 12
 There is no issue for trial unless there is sufficient evidence favoring the non-moving party that a jury would return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 [477 U.S. 242] (1986).
 
 
 13
 Order at 2 (W.D.Wis. Aug. 30, 1988) (emphasis supplied). Whether the inclusion of the word "would" was merely a typographical error or an intentional insertion is unclear; in any event, the standard for summary judgment applied by the district court, as written, is an incorrect statement of law. Anderson requires a district judge to deny a motion for summary judgment if the jury might or could return a verdict for the plaintiff, not if the jury would return such a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 251-55, 257, 106 S.Ct. 2505, 2510, 2511-14, 2514, 91 L.Ed.2d 202 (1986). This error does not necessarily require that we reverse or remand, however; if we agree with Judge Shabaz's conclusion that there is no evidence supporting Dahnke's claim, the application of the district court's standard will amount to harmless error. In any event, we are required to review de novo a district court's grant of summary judgment. Puckett v. Soo Line R.R., 897 F.2d 1423, 1425 (7th Cir.1990).
 
 
 14
 A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Further, "[i]n reviewing a summary judgment, we must view the record and the inferences drawn from it in the light most favorable to the non-moving party." Schlifke v. Seafirst Corp., 866 F.2d 935, 937 (7th Cir.1989). A scintilla of evidence is not enough to defeat a motion for summary judgment, however: the nonmovant must go beyond the pleadings by affirmatively demonstrating the existence of a genuine issue of material fact. Id. at 938.
 
 III.
 
 15
 Dahnke presents two claims to this court: he argues that Local 695 breached its duty to provide him with fair representation, and he contends that Stokely violated its collective bargaining agreement with Local 695 by discharging him. Each of these claims will be considered in turn.
 
 A. Local 695's Duty
 
 16
 Dahnke asserts first that the district court failed to draw reasonable inferences from Business Agent Sam Anderson's decision to drop his grievance. Dahnke argues that Anderson's inaction demonstrates Anderson's hostility toward him, as well as Local 695's breach of its duty to represent him fairly.
 
 
 17
 We must, again, conduct a de novo review of whether the district court drew reasonable inferences from the evidence submitted by the parties. Judge Shabaz wrote that neither party presented any evidence tending to show that Anderson exhibited hostility toward Dahnke.[2] Dahnke did sign a petition seeking Anderson's removal from office but presented no evidence demonstrating that Anderson saw his name on the petition or that Anderson became hostile because of it. Anderson stated in an affidavit that he was not aware that Dahnke signed the petition. Supplemental Affidavit of Sam Anderson at 2 (Aug. 11, 1988).
 
 
 18
 Certainly, we do not rely solely upon affidavits when questions of motive and intent arise in summary judgment proceedings. Egger v. Phillips, 669 F.2d 497, 502 (7th Cir.1982), reh'g granted on other grounds, 710 F.2d 292 (7th Cir.), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). But Dahnke presented the district court with no direct or circumstantial evidence that Anderson acted hostilely toward him:[3] in order to defeat the motion for summary judgment, Dahnke must demonstrate the existence of a genuine issue--and not merely the existence of a slight possibility of an issue--of material fact. And Dahnke acknowledged that Anderson previously warned him about reporting to work on time. The only inference that can be drawn from these warnings is that Anderson acted to protect Dahnke's status as an employee at the plant.
 
 
 19
 Dahnke, in essence, asks us to infer that Anderson's refusal to pursue the grievance to arbitration constitutes a per se breach of Local 695's duty of fair representation. This we will not do. We have held repeatedly that employees have no absolute right to have a grievance pursued to arbitration on their behalf: indeed, "unions have consistently been accorded considerable discretion in deciding whether and to what extent employee grievances should be prosecuted." Zipes v. TWA, Inc., 846 F.2d 434, 441-42 (7th Cir.1988), rev'd on other grounds, --- U.S. ----, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989); see Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) ("A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents...."); Rupe v. Spector Freight Systems, Inc., 679 F.2d 685, 691 (7th Cir.1982) (union must be accorded discretion).
 
 
 20
 Unions need not arbitrate every grievance. Vaca v. Sipes, 386 U.S. 171, 191-92, 87 S.Ct. 903, 917-18, 17 L.Ed.2d 842 (1967); Dober v. Roadway Express, Inc., 707 F.2d 292, 295 (7th Cir.1983); Melendy v. United States Postal Serv., 589 F.2d 256, 259 (7th Cir.1978). "A union is not required to prosecute a grievance that it honestly believes lacks merit." Graf v. Elgin, Joliet & E. Ry., 697 F.2d 771, 779 (7th Cir.1983); see Vaca v. Sipes, 386 U.S. at 192-95, 87 S.Ct. at 917-19. Substantial policy grounds support this conclusion; as the Supreme Court explained in Vaca v. Sipes:
 
 
 21
 If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a significantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully.
 
 
 22
 386 U.S. at 191-92, 87 S.Ct. at 917-18. (footnote omitted). Further, employees should not be asked to underwrite the cost of arbitrating every grievance brought by one of their co-workers against the company; the costs of such a rule would be staggering to those who could least afford it.
 
 
 23
 Here, Anderson presents substantial evidence that he carefully and honestly considered Dahnke's claim before concluding that it lacked merit. Anderson explained in his affidavit:
 
 
 24
 I concluded that there was no basis for pursuing Mr. Dahnke's grievance further. There was no basis for challenging the policy itself, as it had been bargained for, and ratified by the employees themselves. Further, as Mr. Dahnke had not protested any of the points assessed against him, and I had never been given any reason to doubt the company's representations, I concluded that all of the points had been properly assessed against Mr. Dahnke under the policy....
 
 
 25
 Affidavit of Sam Anderson at 4-5. Anderson was left with only two potential challenges to Dahnke's accumulation of points under the Program--first, that the punch clock upon which Stokely relied to record its employees' hours was defective. While the union stewards did argue that the clock occasionally displayed an incorrect time, they did not contend at the meeting with Anderson that the clock ever punched an incorrect time on the cards used by Stokely to assess points. As such, Anderson reasonably could have concluded that the allegedly defective clock did not affect the points accrued by Dahnke. Second, Anderson could have pressed Dahnke's argument that Stokely applied its No Fault Program arbitrarily. Anderson, however, discovered only three instances where an employee was not assessed the proper number of points for an absence. He concluded that these isolated incidents would be insufficient to persuade an arbitrator that Dahnke should be reinstated.
 
 
 26
 Based upon these factors, Anderson refused to pursue the grievance to arbitration; his lack of success arbitrating similar grievances under other no fault absentee programs also supported his decision not to pursue Dahnke's claim. Given these factors, Anderson's decision was well within the discretion accorded to union officials by Vaca v. Sipes, 386 U.S. at 191-95, 87 S.Ct. at 917-19. See Salinas v. Milne Truck Lines, Inc., 846 F.2d 568, 569-70 (9th Cir.1988) ("[P]ast grievance hearings had upheld the discharge of drivers without a warning for any prior incident. Local 63's reliance on precedent suggests that its conduct was not discriminatory or in bad faith."). The fact that Anderson refused to pursue to arbitration at least one other employee's grievance under the Program supports his claim that he consistently believed he could not successfully challenge the Program. See Supplemental Affidavit of Sam Anderson at 2 ("I have not arbitrated a single grievance filed by an employee discharged under the Stokely no-fault attendance policy."). We therefore agree with the district court that Local 695 discharged its duty to represent Dahnke fairly in considering--but not exhaustively pursuing--his grievance.
 
 
 27
 In reaching this conclusion, we decline the parties' invitation to engage in an extensive analysis of our decision in Hoffman v. Lonza, 658 F.2d 519 (7th Cir.1981), and its progeny. In Hoffman, we interpreted the Supreme Court's decision in Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), to require a showing of intentional misconduct in order to prove a breach of the duty of fair representation;[4] therefore, we held that a union's negligent failure to file a timely notice of appeal in the grievance procedure was insufficient, by itself, to demonstrate that the union had breached its duty to Hoffman. But the relevant distinction in the case before us is not that between intentional and negligent, grossly negligent, "egregious" or reckless conduct (as in the Hoffman v. Lonza paradigm). Thus, Dahnke, unlike Hoffman, has not alleged that Anderson forgot to pursue his grievance. Hoffman, 658 F.2d at 520, 523; see Graf v. Elgin, Joliet & E. Ry., 697 F.2d at 774, 777-79. Nor has Dahnke argued that Anderson inadequately prepared for the meeting with the union stewards, see, e.g., Camacho v. Ritz-Carlton, 786 F.2d 242, 244-45 (7th Cir.), cert. denied, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986), or that he received "perfunctory" representation from union officials. See, e.g., Grant v. Burlington Indus., 832 F.2d 76, 79-80 (7th Cir.1987). Dahnke simply urges that Anderson's discretionary and presumably non-arbitrary refusal to pursue his grievance to arbitration constitutes a breach of his duty of fair representation. We have already determined that Anderson's decision not to pursue the claim was well within his discretion not to arbitrate every grievance. We therefore conclude that the district court properly granted summary judgment to the defendants on this claim.
 
 B. The Collective Bargaining Agreement
 
 28
 Dahnke's second assertion requires less discussion. Dahnke contends that Stokely violated its collective bargaining agreement with Local 695 by discharging him. He admits in his brief, however, that this contention is conditioned on his ability to demonstrate that the union has violated its duty of fair representation: "If a plaintiff can meet the threshold requirement of showing a violation of the Union's duty, the plaintiff then has the right to seek to prove the breach of contract action against the employer." Appellants' Brief at 19 (emphasis supplied). This is a correct statement of law. When a union has exclusive power under a collective bargaining agreement to invoke the grievance process, an employee may pursue an individual claim only if his union wrongfully refuses to process the claim. See, e.g., Vaca v. Sipes, 386 U.S. at 185, 87 S.Ct. at 914; Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 570-71, 96 S.Ct. 1048, 1059-60, 47 L.Ed.2d 231 (1976); Freeman v. Local Union No. 135, 746 F.2d 1316, 1321 (7th Cir.1984). Since we have concluded that Local 695 did not wrongfully refuse to process Dahnke's claim, Dahnke may not pursue this claim on his own.
 
 IV.
 
 29
 Finally, Dahnke and his attorney contest the imposition of Rule 11 sanctions against them in the amount of $8032.50 (to Local 695) and $9622.50 (to Stokely). Local 695 and Stokely urge this court to uphold these sanctions and, on cross-appeal, seek recoupment of attorney's fees incurred in state administrative proceedings before this case was removed to federal court.
 
 
 30
 As a preliminary matter, the parties devote pages in their briefs to the standard by which they claim we should review the district court's imposition of sanctions. That standard, however, is firmly established in this circuit. In Mars Steel Corp. v. Continental Bank N.A., 880 F.2d 928 (7th Cir.1989) (en banc), we adopted a deferential standard of reviewing district court decisions involving Rule 11 sanctions "whether sanctions were imposed or not, whether the question be frivolousness on the objective side of Rule 11 or bad faith on the subjective side." Id. at 930. Of course, " '[r]eview under the abuse of discretion standard does not mean no appellate review.' ... Deferential review will not prevent this court from ensuring that district judges reflect seriously, and consider fully, before imposing (or denying) sanctions." Id. at 936 (quoting In re Ronco, Inc., 838 F.2d 212, 217 (7th Cir.1988)). Indeed, the Supreme Court recently upheld our approach in Cooter & Gell v. Hartmax Corp., --- U.S. ----, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).
 
 
 31
 Judge Shabaz imposed $17,655 in sanctions upon Dahnke and his attorney, which amounted to the "reasonable" attorney's fees "attributable to plaintiff's actions in this Court":
 
 
 32
 Plaintiff opposed defendants' motions for summary judgment which would not have been necessary had plaintiff's counsel withdrawn the complaint or moved for dismissal when it became obvious that the Seventh Circuit's clear standard regarding violation of a union's duty of fair representation outlined in Grant v. Burlington, 832 F.2d 76 (7th Cir.1987), did not allow this case to proceed.
 
 
 33
 Memorandum and Order at 1-2 (W.D.Wis. Oct. 14, 1988) (emphasis supplied). Apparently, Judge Shabaz concluded that "it became obvious" (or should have become so) to Dahnke and his attorney on July 1, 1988, that the case could not proceed. Id. at 2. The selection of July 1, 1988, is something of a mystery, however. Dahnke initiated his complaint in the Wisconsin Employment Relations Commission on February 25, 1988; the defendants removed the case to federal court about a month later, on March 18, 1988. Indeed, Dahnke's attorney did not file any substantive documents with the district court on or before July 1, 1988, and did not file her brief in opposition to the defendant's motion for summary judgment until August 4, 1988. The district court's imposition of sanctions, then, was not triggered by the signing and filing of any specific document in federal court; rather, the district court imposed sanctions from the date on which "it became obvious" that the action was frivolous.
 
 
 34
 This set of circumstances poses an interesting question: how should federal courts apply Rule 11 to federal cases commenced in state court (or state administrative agencies)? Federal Rule of Civil Procedure 11 provides in pertinent part:
 
 
 35
 Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
 
 
 36
 Fed.R.Civ.P. 11. The act of signing the pleading, motion or other paper serves as certification that, based upon the signer's judgment, the action is not frivolous. But what if papers are signed and filed in a state administrative proceeding, and the case is then removed to federal court?
 
 
 37
 There seems to be little question that federal courts cannot impose Rule 11 sanctions on a party for actions taken in state court (or in state administrative proceedings). Rule 11 imposes an affirmative duty on parties to conduct a pre-filing inquiry before filing documents in federal court; when a state court pleading is signed and filed, however, the signer is not subject to the Federal Rules of Civil Procedure. Therefore, federal courts may not properly sanction the signer under Rule 11 for conduct occurring solely in state courts or administrative tribunals. See, e.g., Foval v. First Nat'l Bank of Commerce, 841 F.2d 126, 130 (5th Cir.1988); Hurd v. Ralphs Grocery Co., 824 F.2d 806, 808 (9th Cir.1987); Stiefvater Real Estate, Inc. v. Hinsdale, 812 F.2d 805, 809 (2d Cir.1987); Kirby v. Allegheny Beverage Corp., 811 F.2d 253, 257 (4th Cir.1987); Brown v. Capitol Air, Inc., 797 F.2d 106, 108 (2d Cir.1986); Schmitz v. Campbell-Mithun, Inc., 124 F.R.D. 189, 191 (N.D.Ill.1989). As the Fourth Circuit explained in Kirby:
 
 
 38
 By its terms, Rule 11 provides for sanctions when a pleading is signed "in violation of this rule." At the time a state court pleading is signed, the signing attorney is not subject to the Federal Rules of Civil Procedure. Therefore, a pleading signed in a state court proceeding which is later removed to federal court clearly cannot be signed in violation of Rule 11.
 
 
 39
 811 F.2d at 257 (emphasis supplied). Since Dahnke and his attorney filed their action in a state administrative agency, the Wisconsin Employment Relations Commission, any sanctions imposed against the appellants for their conduct in that forum must be based upon the rules of that forum, not ours.
 
 
 40
 Once the frivolous (by Rule 11 standards) document is removed to federal court, however, is the original signer required to conduct further investigation? The answer to this question depends, at least in part, upon whether Rule 11 should be construed "to impose a continuing duty on parties and counsel to revise pleadings to conform to newly discovered information." Schmitz, 124 F.R.D. at 191. Courts and commentators have divided on this issue. Compare Herron v. Jupiter Transp. Co., 858 F.2d 332, 335-36 (6th Cir.1988); Note, Rule 11 of the Federal Rules of Civil Procedure and the Duty to Withdraw A Baseless Pleading, 56 Fordham L.Rev. 697 (1988) (both advocating continuing duty), with Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Associated Contractors, Inc., 877 F.2d 938, 943 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1133, 107 L.Ed.2d 1038 (1990); Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 874 (5th Cir.1988) (en banc); Gaiardo v. Ethyl Corp., 835 F.2d 479, 484 (3d Cir.1987); Oliveri v. Thompson, 803 F.2d 1265, 1274-75 (2d Cir.1986), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) (all opposing continuing duty).
 
 
 41
 This is not a question of first impression in our circuit. This court has, on previous occasions, considered whether Rule 11 imposes a duty upon signers continuously to update their pleadings to conform to new evidence or legal standards. In Pantry Queen Foods v. Lifschultz Fast Freight, Inc., 809 F.2d 451 (7th Cir.1987), for example, we held that "Rule 11 does not require the updating of papers that were not subject to sanctions when filed." Id. at 454.[5] See also Samuels v. Wilder, 906 F.2d 272 (7th Cir.1990) (approving Pantry Queen Foods ); Hamer v. County of Lake, 819 F.2d 1362, 1370 n. 15 (7th Cir.1987) ("Rule 11 does not impose a continuing obligation on attorneys to reevaluate the merits of the case as the litigation develops."). Judge Easterbrook, writing for the panel in Pantry Queen Foods, noted that neither the face of Rule 11 nor the Advisory Committee's commentary suggested a requirement of continual updates of pleadings. Further, that panel expressly agreed with the position taken by the Second Circuit in Oliveri v. Thompson, 803 F.2d 1265 (2d Cir.1986). That circuit reasoned:
 
 
 42
 Rule 11 applies only to the initial signing of a "pleading, motion, or other paper". Limiting the application of rule 11 to testing the attorney's conduct at the time a paper is signed is virtually mandated by the plain language of the rule. Entitled "Signing of Pleadings, Motions, and Other Papers; Sanctions", the rule refers repeatedly to the signing of papers; its central feature is the certification established by the signature.
 
 
 43
 In addition, when rule 11 was amended in 1983 to make sanctions mandatory, the rule was also amended to include the words "motion or other paper" each time after the word "pleading" was used. Thus, amended rule 11 applies to every paper signed during the course of the proceedings and not only to the pleadings. While the drafters of the rule could easily have further extended its application by referring to the entire conduct of the proceedings, they failed to do so and instead chose to expand only the categories of papers to which the rule applies.
 
 
 44
 Moreover, the advisory committee note to the amended rule states that the signer's conduct is to be judged as of the time the pleading or other paper is signed. Fed.R.Civ.P. 11 advisory committee note. It is difficult to imagine why this comment would be made if the rule were meant to impose a continuing obligation on the attorney.
 
 
 45
 Id. at 1274. We follow the panel's conclusion in Pantry Queen Foods that Rule 11 does not impose a continuing obligation upon attorneys.[6]
 
 
 46
 Since we have determined that a signer may not incur Rule 11 sanctions for actions he took in state proceedings before federal jurisdiction was invoked, and since we have also concluded that signers have no obligation under Rule 11 to make continuous updates to previously filed pleadings and papers, we hold that Rule 11 cannot support the imposition of sanctions from the time an action is removed to federal court until a party files its first papers in that court. The district court in this case improperly imposed sanctions upon Dahnke and his attorney before they made any filings in federal court. Thus, we must vacate this part of the district court's judgment and remand the case to the district court for recalculation of sanctions.
 
 
 47
 To provide guidance to the district court on remand, we note our general agreement with that court that Dahnke's position below was frivolous and, should the district court find that specific filings articulated this position, it may properly impose sanctions against Dahnke and his attorney. As we explained above, supra Part III(A), Sam Anderson's decision not to pursue Dahnke's grievance was well within his discretion not to bring every grievance to arbitration. Further, Dahnke and his counsel failed in the district court to recognize the appropriate standard for Seventh Circuit fair representation cases. As Judge Shabaz explained,
 
 
 48
 In this case existing law did not authorize this cause of action, and it cannot be argued in good faith that an extension, modification or reversal of existing law is reasonable to assume. The case law is clear that the appropriate standard for a violation of a union's duty of fair representation is "intentional misconduct." See Grant v. Burlington Industries, 832 F.2d 76 (7th Cir.1987).
 
 
 49
 Any reasonable person should have known that Local 695 did not breach its duty of fair representation to plaintiff and did not commit intentional misconduct. Local 695 is entitled to attorney fees.
 
 
 50
 Order at 16 (W.D.Wis. Aug. 30, 1988). This explanation demonstrates that Judge Shabaz carefully considered the arguments for and against sanctions. Mars Steel, 880 F.2d at 936. In addition, Judge Shabaz's explanation fully comports with this court's decisions in Brown v. Federation of State Medical Boards, 830 F.2d 1429, 1438 (7th Cir.1987), and Szabo Food Service, Inc. v. Canteen Corp., 823 F.2d 1073, 1084 (7th Cir.1987), cert. denied, 485 U.S. 901, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988), by offering reasons for the imposition of sanctions.[7]
 
 V.
 
 51
 Stokely fired Frederick Dahnke because he consistently arrived late for work and therefore accrued more than twelve points under the No Fault Absentee Program. Teamsters Local 695 declined to bring his case to arbitration due to the case's lack of merit. Neither of these actions violated federal law. The only potential violations in this case were the appellants' signing and filing of allegedly frivolous papers in district court. We leave the resolution of this Rule 11 question, however, to the district court to consider on remand.
 
 
 52
 AFFIRMED IN PART, VACATED IN PART AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 Points were removed for consistent attendance and overtime work
 
 
 [2]
 We are intrigued by Dahnke's contention that Anderson's alleged hostility toward another employee, Jerome Erickson, is somehow relevant to this case. Dahnke alleged that Anderson told Erickson "to shut up" when Erickson asked about the No Fault Program. That Anderson exhibited hostility toward someone who objected to the No Fault Program before its inception is hardly probative of Anderson's feelings toward a different employee who did not object until after he had accrued sufficient points to be discharged. Further, Dahnke has not demonstrated that a "transitive property of hostility" exists in our jurisprudence
 
 
 [3]
 After the district court issued its opinion, Dahnke filed a motion to amend the judgment pursuant to Rule 59(e), contesting the imposition of Rule 11 sanctions. At that time, he submitted the affidavit of union steward David Ebert, which stated that Anderson had prevented him from providing examples of Stokely's non-uniform application of the No Fault Absentee Program. This argument should have been presented before the district court rendered its decision on the motions. Dahnke waived this argument by failing to offer it in a timely fashion. See FDIC v. Meyer, 781 F.2d 1260, 1268 (7th Cir.1986); Keene Corp. v. International Fidelity Ins. Co., 736 F.2d 388, 393 (7th Cir.1984); Liberles v. County of Cook, 709 F.2d 1122, 1126 (7th Cir.1983)
 
 
 [4]
 Although Hoffman 's "intentional misconduct" standard is well-established in our circuit, it is not accepted universally. See Thomas v. United Parcel Serv., 890 F.2d 909, 922 n. 5 (7th Cir.1989); Grant v. Burlington Indus., 832 F.2d 76, 79 & n. 2 (7th Cir.1987) (both citing cases)
 
 
 [5]
 Flip Side Productions, Inc. v. JAM Productions, Ltd., 843 F.2d 1024 (7th Cir.1988), while considering the propriety of Rule 11 sanctions in a similar case, did not expressly address this issue
 
 
 [6]
 We note that 28 U.S.C. section 1927 authorizes courts to order attorneys who "multipl[y] the proceedings in any case unreasonably and vexatiously" to reimburse the reasonable attorney's fees incurred due to such conduct. Unlike Rule 11, section 1927 has been interpreted in our circuit to impose a continuing duty upon attorneys to dismiss claims that are no longer viable. See, e.g., Insurance Benefit Adm'rs, Inc. v. Martin, 871 F.2d 1354, 1360 (7th Cir.1989); Walter v. Fiorenzo, 840 F.2d 427, 433-36 (7th Cir.1988). Neither the district court nor the appellees in this case has claimed that section 1927 sanctions are warranted against Dahnke's attorney, and, as we recognized in Samuels v. Wilder, 906 F.2d 272 (7th Cir.1990), "[s]ection 1927 and Rule 11 are addressed to different conduct ... Sec. 1927 differs from Rule 11 because it does not require 'reasonable' investigation." Since the basis of Judge Shabaz's imposition of sanctions seems to have been Dahnke's failure to investigate the legal foundation for his claim before filing it in federal court ("Any reasonable person should have known that Local 695 did not breach its duty of fair representation," Order at 16 (W.D.Wis. Aug. 30, 1988))--and not that Dahnke's attorney "multiplie[d] the proceedings ... unreasonably and vexatiously,"--section 1927 is not implicated here
 
 
 [7]
 We note, finally, that the district court's determination of reasonable hourly attorney's rates was well within its discretion. Cf. Frantz v. United States Powerlifting Fed'n, 836 F.2d 1063 (7th Cir.1987)